**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT WASHINGTON (#M06106), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 12-cv-10236 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| DAVID GOMEZ, Warden, | ) | |
| Stateville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Robert Washington, a prisoner currently incarcerated at Stateville Correctional Center, has brought this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254, challenging his 2008 murder conviction in the Circuit Court of Cook County. For the reasons stated below, the Court denies Washington's amended § 2254 petition on the merits and declines to issue a certificate of appealability.

### FACTUAL BACKGROUND

State court factual findings have a presumption of correctness, and Washington has the burden of rebutting the presumption by clear and convincing evidence. *Brumfield v. Cain*, 576 U.S. 305, 322 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)). Washington has not made such as showing. And so the Court draws the following factual history from the state court record. (Dkt. No. 72.)

Washington shot and killed Ricky Carpenter on the afternoon of September 17, 2006, in the first floor hallway of Carpenter's apartment building in the Back of the Yards neighborhood on the southside of Chicago. *Illinois v. Washington*, No. 1-09-1817, 2011 WL 9693712, at *1–*2

(Ill. App. Ct. Apr. 25, 2011) ("*Direct Appeal*"). There was no dispute at trial that Washington shot and killed Carpenter; the only question was whether Washington acted in self-defense.

In addition to Washington and Carpenter, four other individuals were present that day. Karen Johnson and Vivian Shields, each of whom rented apartments in the building, had gone with Washington to the grocery and liquor stores earlier in the day. *Id*. at *1. Upon returning home, the group hung out talking in front of the apartment building. *Id*. A third woman, Mignon Boswell, joined the group in front of the building. *Id*. Boswell was the victim's girlfriend, and they lived together in the building. *Id*.

Washington made sexual comments to the women, telling Shields that he liked her breasts and Boswell that he wanted to have sex with her. *Id*. This angered Carpenter, who overheard Washington's comments towards his girlfriend. *Id*. Washington and Carpenter began arguing, and Carpenter threw beer in Washington's face. *Id*. Carpenter also picked up a nearby crate and threatened to "bust" Washington's face. *Id*. The women separated the men, and Boswell took Carpenter back upstairs to their apartment. *Id*. Shields, who testified at Washington's trial, stated that she did not see Washington possess a gun either while they were shopping or during the initial confrontation. *Id*.

Unfortunately, separating the men did not defuse the situation. Washington remained outside by the apartment building where he made a call on his cell phone. *Id*. Once he got off the phone, he told Shields and Johnson that Carpenter was going to get "his ass whooped." *Id*. Washington then moved his car, which had been parked in front of the apartment building, away from the building. *Id*. Shields, who remained in front of the building, later saw Washington walk back towards the building after moving his car. *Id*.

2

After taking Carpenter upstairs following the initial confrontation, Boswell called the his sister, who, in turn, called his brother at approximately 3:00 p.m. *Id.* at *2. Carpenter's brother, who had been Washington's friend for seven or eight years, came to the apartment building and spoke to Washington once he returned from moving his car. *Id.* at *1-*2. The two men walked together by the apartment building. *Id.* at *2. The brother's arm was around Washington's shoulder when Carpenter came downstairs and started hollering at Washington. *Id.* at *2. Washington looked back over his shoulder and warned Carpenter not to run up behind him. *Id.* at *1.

Washington and Carpenter continued arguing as they entered the apartment building's first-floor hallway. *Id.* at *2. Carpenter's brother followed behind the men into the hallway. *Id.* Shields witnessed Washington pull out his gun shortly before the men headed into the hallway. *Id.* She fled to Johnson's apartment once she saw the gun. *Id.* She heard two gunshots but did not see who fired the shots. *Id.* She did testify at trial, however, that Washington had the gun and that Carpenter was unarmed. *Id.*

Carpenter's brother testified at trial that he followed the men into the apartment hallway. *Id.* In describing what happened next, he testified that Washington was armed with the gun while Carpenter was unarmed. *Id.* Carpenter told Washington he did not care that he had a gun. *Id.* Washington threatened to shoot Carpenter. *Id.* Washington then followed through on his threat and shot Carpenter in his leg. *Id.* Carpenter stumbled and slumped against the hallway wall. *Id.* Washington then shot Carpenter in the stomach. *Id.* A later autopsy showed that Carpenter was not shot at close range. *Id.* at *3.

3

The police and paramedics were called to the apartment building. *Id*. at *2. The paramedics rolled Carpenter over to examine him for wounds. *Id*. He had a knife in his back pocket. *Id*. Carpenter's brother testified that was the first time he saw his brother with a knife. *Id*. Washington was taken to the hospital where he died from the gunshot wounds. *Id*. at *3.

A Chicago police evidence technician arrived at the crime scene by 3:30 p.m. *Id*. at *2. The technician recovered a stainless steel knife from the hallway floor. *Id*. The knife was found approximately one foot from the blood on the floor, and there was no blood on the knife. *Id*.

Washington testified on his own behalf at trial. *Id*. at *3. He admitted that he made sexual comments regarding Shields' breasts and clarified that he told Boswell that he wanted to have sex with her when they were younger. *Id*. Washington also agreed that Carpenter walked in on the conversation and heard his comment to Boswell. *Id*. However, Washington claimed he apologized to Boswell. *Id*. The apology did not defuse the situation, as Carpenter swore at him, threw beer in his face, and picked up a crate and threatened to "bust" it in his face. *Id*. Washington also testified that Carpenter said he would be right back after the initial confrontation because he had "something" for Washington. *Id*.

Washington conceded that he did make a phone call after the initial confrontation, and that following the call he told Johnson and Shields that his "boy" was on the way to kick the victim's ass. *Id*. He further agreed that he moved his car from in front of the apartment building to around the corner out of concern that Carpenter might harm his car. *Id*.

Washington verified that Carpenter's brother met him in front of the apartment building and they started to talk. *Id*. Carpenter's brother did put his arm around Washington, but according to Washington, the brother turned around and said to someone, "Don't run up on him

4

yet," while walking with his arm around Washington. *Id*. Washington said he pushed Carpenter's brother away and turned to see the victim standing in the apartment building doorway. *Id*.

Washington conceded he pulled out a gun from his pocket at that point. *Id*. He claims Carpenter approached him in "sneak mode," with a "shiny object pointing in [Carpenter's] right hand." *Id*. at *4. Washington believed that Carpenter had a knife, so he fired his gun. *Id*. Washington explained that he aimed the gun "at the floor" in an attempt to hit the victim "anywhere below the waist" to stop him from advancing. *Id*. Washington conceded that Carpenter was six to eight feet from him when Washington turned to see him. *Id*. Washington also conceded that Carpenter was "not standing right up on him with the knife" and could not have stabbed Washington when Washington shot Carpenter. *Id*. However, Washington said that he feared for his life—both because Carpenter was advancing on him and because Carpenter's brother was standing next to him. *Id*. Washington expressed concern that Carpenter's brother might have held him while the victim approached. *Id*.

Washington fled after shooting the victim. *Id*. He admitted giving "quite a few stories" to the police after his arrest but never told police the version to which he testified in court *Id*. Washington explained that he denied shooting Carpenter when questioned by the police because he did not trust the police. *Id*.

Washington was found guilty by the jury and sentenced to fifty years of imprisonment. *Id*. at *5. He has completed his state direct appeal and collateral proceedings. Washington initially filed a habeas corpus petition in this Court while his state-court proceedings were pending. The Court stayed the present habeas corpus action until the state-court proceedings

were complete. (Dkt. No. 12.) Washington then filed the present amended habeas corpus petition. (Dkt. No. 34.)

## DISCUSSION

### I.     Claim One

Washington raises two allegations of ineffective assistance of counsel. The first involves an investigative report that was improperly given to the jury. Following the jury verdict, the prosecutor heard the jurors mention a witness statement in a police report. *Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *5. This confused the prosecutor, as there was no witness statement in a police report admitted into evidence and provided to the jury at trial. *Id*. The prosecutor reviewed the exhibits tendered to the jury and found that an investigator's report from the Cook County Medical Examiner's Office had been inadvertently attached to the post-mortem examination report. *Id*. The post-mortem report regarding the autopsy of the victim had been admitted into evidence. *Id*. The improperly attached investigator's report included a statement by the investigator that, "according to the Chicago Police Report, the subject and the offender were having a verbal altercation. The offender stated that he was 'going to get a gun.'" *Id*. The state appellate court rejected Washington's argument that his attorney was ineffective for failing to find the report before the autopsy report was tendered to the jury as an exhibit. *Id*. at *6. Washington renews that ineffective assistance of trial counsel argument in his habeas corpus petition.

The Court's review of this claim is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Moreover, the Court's review focuses on the state appellate court's opinion on direct appeal because that was the last state court to resolve the claim on the merits.

*See Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)).

Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court's decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

An ineffective assistance of counsel claim is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Washington must demonstrate both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Court's review under *Strickland* is deferential, and applying *Strickland* under the AEDPA, which itself also requires deference, results in a double level of deference to the state-court determination. *Knowles*, 556 U.S. at 123.

Washington cannot prevail on a "contrary to" argument because the state appellate court properly set forth the controlling *Strickland* standard. *Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *5. Similarly, the state appellate court's rejection of Washington's argument was not

an unreasonable application of *Strickland* because Washington cannot demonstrate prejudice as a result of the erroneous inclusion of the report.

To show prejudice, Washington must demonstrate, "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 694). But there was overwhelming evidence of Washington's guilt to support the first-degree murder conviction. As the state appellate court correctly recognized when rejecting this ineffective assistance of counsel argument:

> [T]he evidence of defendant's guilt of first-degree murder was overwhelming where: Mr. Carpenter testified defendant was the aggressor in the shooting; Ms. Shields and Mr. Carpenter testified the victim was not holding a knife at the time he was shot; Dr. Arunkumar testified there was no evidence of close range firing in her examination of the gunshot wounds sustained by the victim; defendant testified during cross-examination that, at the time of the shooting, the victim was not close enough to stab him; and defendant admittedly told the police "quite a few stories" inconsistent with his trial testimony and initially falsely denied shooting the victim.

*Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *6. The state appellate court's rejection of Washington's argument on this point was neither contrary to, nor an unreasonable application of, *Strickland*.

Washington also raises as a second ineffective assistance of counsel argument that his attorney was hostile to him in closing arguments by calling him an idiot, laughing about his situation, vouching for Shields's truthfulness, and referencing additional eyewitnesses. The state appellate court rejected this argument on direct appeal, explaining its view that trial counsel was attempting to concede Washington's improper conduct while still arguing that he was not guilty of first-degree murder. The state appellate court's understanding of trial counsel's strategy was a

8

reasonable interpretation of the record. Defense counsel does appear to have been fronting Washington's improper actions in making sexual comments to the women and carrying a firearm, in a hope that the jury would agree with him when he argued that Washington's self-defense claim should be believed. Moreover, as explained above, the evidence of Washington's guilt was overwhelming.

In short, both of Washington's *Strickland* arguments were properly rejected by the state appellate court on direct appeal. Claim One is thus denied.

## II.     Claim Two

Washington next argues that the evidence was insufficient to support his first-degree murder conviction, and instead, his conviction should be reduced to second-degree murder. The state appellate court rejected this claim on direct appeal. *Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *9.

For a second-degree murder conviction under Illinois law, the prosecution has the initial burden of proving the defendant guilty of first-degree murder beyond a reasonable doubt. *Id.* (citing *Illinois v. Hawkins*, 696 N.E.2d 16, 20 (Ill. App. Ct. 1998)). Once the state has met its burden regarding first-degree murder, the burden shifts to the defendant to prove by a preponderance of the evidence either of the following mitigating factors: (1) that the defendant was acting under a sudden and intense passion resulting from serious provocation from the victim; or (2) that the defendant had an unreasonable belief in the need for self-defense. *Id.*

To the extent Washington is challenging the sufficiency of the evidence supporting his first-degree murder conviction, the Court applies a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). First, the Court must defer to the verdict. "'[I]t is

the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.'" *Id.* at 43 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "The evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 43 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). Second, the Court defers to the state-court ruling under the AEDPA. 28 U.S.C. § 2254(d).

Despite Washington's protestations, however, there was sufficient evidence to support the first-degree murder conviction. Multiple witnesses saw Washington and Carpenter get into a verbal altercation. Washington returned armed with a gun. Carpenter's brother witnessed Washington shoot the victim, while a second eyewitness saw Washington with the gun and then heard the gunshots. Both witnesses testified that Carpenter was not armed when Washington shot him. In sum, the evidence at trial clearly provided sufficient support for Washington's first-degree murder conviction.

Washington's remaining argument that the state court erred in not reducing his conviction to second-degree murder presents a question of state law that is not cognizable in a federal habeas corpus proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Davis v. Lemke*, No. 12 C 1550, 2014 WL 562454, at *7 (N.D. Ill. Feb. 13, 2014). And even if the question of whether the state court should have reduced Washington's conviction to second-degree murder were cognizable, the Court would still reject that claim, as there was overwhelming evidence to support the first-degree murder conviction. For these reasons, Claim Two is denied as well.

### III.    Claim Three

With his third claim, Washington argues that his trial counsel was ineffective for failing to call Carpenter's girlfriend, Boswell, in support of his self-defense argument. The Illinois Supreme Court has held that, "when self-defense is properly raised, evidence of the victim's aggressive and violent character may be offered for two reasons: (1) to show the defendant's knowledge of the victim's violent tendencies affected defendant's perceptions of and reactions to the victim's behavior; and (2) to support the defendant's version of the facts where there are conflicting accounts of what happened." *Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *10 (citing *Illinois v. Lynch*, 470 N.E.2d 1018 (Ill. 1984); *Illinois v. Nunn*, 829 N.E.2d 796, 801 (Ill. App. Ct. 2005)) (internal quotation marks omitted). Illinois courts commonly refer to this type of evidence as "*Lynch* evidence."

Prior to trial, the trial court granted the prosecution's motion *in limine* and precluded the introduction of testimony regarding an incident occurring a week prior to the murder in which Carpenter swung a frying pan and wielded a knife at a man attempting to crawl through a window into his apartment. *Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *10. Two additional incidents were brought up before the trial court during consideration of the motion *in limine*. An investigator interviewed Boswell in June 2007. *Illinois v. Washington*, No. 2015 IL App (1st) 130064-U, 2015 WL 1514722, at *1 (Ill. App. Ct. Mar. 31, 2015) ("*Post-Conviction Appeal*"). The investigator's report from his interview detailed two potential *Lynch* evidence items. *Id*. The first was that Carpenter beat Boswell for three days when they previously lived in Atlanta. *Id*. Apparently, Boswell had explained to the investigator that Carpenter was "definitely

violent with women." *Id*. In the other incident, Carpenter allegedly told Boswell that he had AIDS and was "ready to die" rather than die slowly from the disease. *Id*.

The state did not object prior to trial to the introduction of the beating of Boswell in Atlanta as *Lynch* evidence. *Id*. And the trial court reserved judgment on whether the AIDS-related testimony was *Lynch* evidence until trial. But Boswell was not called to testify at trial, so the jury did not hear any *Lynch* evidence in support of Washington's self-defense argument. The state appellate court on direct appeal affirmed the granting of the motion *in limine* regarding the home invasion, finding that it was not *Lynch* evidence because Carpenter was defending his home from an intruder and thus it did not suggest a violent character. *Direct Appeal*, No. 1-09-1817, 2011 WL 9693712, at *10.

In his post-conviction petition, Washington raised a claim of ineffective assistance of trial counsel based on his counsel's failure to call Boswell as a witness regarding the Atlanta beatings and Carpenter's mindset regarding his AIDS. *Post-Conviction Appeal*, No. 2015 IL App (1st) 130064-U, 2015 WL 1514722, at *2. The claim was denied, and the appellate court affirmed the holding that the failure to call Boswell had no impact on the trial because the evidence of Washington's guilt was overwhelming. *Id*. at *4.

Indeed, the eyewitnesses testified that Carpenter was unarmed when Washington confronted him with a gun. While Washington claimed that the victim was actually armed, the jury was entitled to believe the prosecution's version of events and conclude that Washington shot an unarmed man. The evidence supports that conclusion. Moreover, the state appellate court was correct that introducing the *Lynch* evidence would have had no impact on the case due to the overwhelming nature of the evidence. Thus, the state appellate court's rejection of Washington's

12

ineffective assistance of counsel claim was not unreasonable under *Strickland*, and Claim Three is denied.

### IV.    Claim Four

Washington argues in Claim Four that his trial attorney was ineffective for failing to investigate the paramedics and other first responders. Carpenter's brother claims he first saw a knife in Carpenter's back pocket while he was being assisted by the paramedics. A knife was also recovered by the police crime scene investigator. Washington believes that his attorney should have inquired with the paramedics and other first responders whether they saw the victim with a knife to bolster Washington's self-defense argument.

This claim, however, is procedurally defaulted. The issue was first raised in Washington's post-conviction petition, but it was not included in Washington's counseled post-conviction appeal. (Dkt. No. 72-17.) He did attempt to raise the issue *pro se* in his post-conviction appeal. (Dkt. No. 72-20.) And the state appellate court initially granted him leave to file a *pro se* brief in addition to his counseled brief (Dkt. No. 72-24), but that request was later vacated following opposition by the state (Dkt. No. 72-25, 72-26). Illinois law disfavors hybrid representation, and a state appellate court's denial of a *pro se* supplemental brief results in an independent and adequate state ground of decision precluding habeas corpus review of the claim. *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017). Thus, the state appellate court's denial of Washington's request to file his supplemental *pro se* brief results in the procedural default of the claim.

Washington cannot excuse his default through cause and prejudice or based on a fundamental miscarriage of justice. A finding of cause requires an "'objective factor, external to

13

the defense that impeded [the petitioner's] efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of grounds for cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two types of cause are not applicable here. And an ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Washington, however, has not exhausted any ineffective assistance of counsel argument to excuse the default of this claim.

Although ineffective assistance of counsel is "a single ground for relief no matter how many failings the lawyer may have displayed," *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Washington must raise the particular factual basis for each aspect of the allegation of ineffective assistance of counsel to avoid procedural default. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [the petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "[The petitioner] cannot argue one theory [of ineffective assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)). Accordingly, that the ineffective

assistance of counsel claim constituting Claims One and Three are properly exhausted does not excuse Washington's default of Claim Four.

Moreover, Washington cannot argue that his post-conviction counsel's failure to preserve the claim on post-conviction appeal excuses the default. While the United States Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), permitted ineffective assistance of post-conviction trial counsel to excuse a defaulted ineffective assistance of trial counsel claim, such is not the case here, as the default arises from the failure to raise the claim in a post-conviction appeal. *Steward v. Gilmore*, 80 F.3d 1205, 1212 (7th Cir. 1996) (holding that ineffective assistance of post-conviction appellate counsel does not constitute cause to excuse a default). And moreover, *Martinez* and *Trevino* are inapplicable to Illinois prisoners. *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018).

That leaves the fundamental miscarriage of justice (*i.e.*, actual innocence) as the only gateway to excuse Washington's default. To show actual innocence, Washington must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Washington must present new, reliable evidence that was not presented at trial—such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see also McDonald v. Lemke*, 737 F.3d 476, 483–84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological

(DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). Here, Washington has offered no new evidence suggesting that he is actually innocent; on the other hand, the evidence of his guilt at trial was overwhelming. *See Hayes*, 403 F.3d at 938 ("[I]t is black letter law that testimony of a single eyewitness suffices for a conviction even if 20 bishops testify that the eyewitness is a liar."). The jury rejected Washington's argument that Carpenter was armed, instead crediting those witnesses who testified that Carpenter was unarmed.

Finally, even putting aside the default, Washington's ineffective assistance of counsel argument in Claim Four is meritless. He provides no evidence regarding what the investigation of the paramedics would have revealed. Moreover, whatever information the paramedics might have contributed would not change the fact that two eyewitnesses testified that Carpenter was unarmed. The witnesses also saw Washington pull his gun while he was several feet away from Carpenter, and Washington even conceded at trial that he was multiple feet away from Carpenter and out of range of any possible thrust with a knife. For all of these reasons, Claim Four is denied.

## V.    Claim Five

With Claim Five, Washington contends that his trial counsel was ineffective for failing to object to the improper statement in the post-mortem report. This claim is, of course, a variation on Claim One, which challenged counsel's failure to locate the improper material included in the report. As explained above, counsel's alleged failure did not result in ineffective assistance of counsel due to the overwhelming nature of the evidence against Washington.

Washington nonetheless argues that his counsel should have objected to the improper material (assuming he found it) because it contained improper hearsay and its introduction violated his confrontation rights. As with Claim Four, however, this claim was improperly raised in Washington's supplemental post-conviction *pro se* brief, which was rejected by the state appellate court. (Dkt. No. 72-20 at 13; Dkt. No. 72-26.) And so, like Claim Four, Claim Five is procedurally defaulted and Washington cannot excuse the default. *Clemons*, 845 F.3d at 820.

Moreover, as explained in Claim One, any error from the erroneous introduction of the improper information in the report is harmless and so Washington cannot demonstrate ineffective assistance of counsel. The evidence of Washington's guilt is overwhelming and the improper information in the report does not change that fact. Claim Five is denied.

## VI.    Claim Six

Claim Six argues that trial counsel failed to investigate which jurors viewed the improper material in the post-mortem report, and what impact it had on the verdict. Like with Claims Four and Five, this claim was improperly asserted through Washington's *pro se* supplement brief in his postconviction appeal before the state appellate court.   (Dkt. 72-20, pg. 19; Dkt. 72-26.) Claim Six is procedurally defaulted, and Washington cannot excuse his default. *Clemons*, 845 F.3d at 820.

In any case, Washington cannot demonstrate the ineffectiveness of his attorney because the evidence of his guilt was overwhelming. In *Remmer v. United States*, 347 U.S. 227 (1954), the United States Supreme Court held that extrajudicial communication with jurors aimed at influencing the jurors' verdict may be presumed prejudicial. *United States v. Gallardo*, 497 F.3d 727, 735 (7th Cir. 2007) (citing *Remmer*, 347 U.S. at 229). But the *Remmer* presumption does

not apply when, as here, the jurors simply received extraneous materials. *Gallardo*, 497 F.3d at 735. Without the *Remmer* presumption of prejudice, the Court returns to the analysis of Claim One, recognizing that any improper material submitted to the jury was cured by the overwhelming nature of Washington's guilt. Even if the *Remmer* prejudice presumption did apply, *Remmer* would still be subject to the substantial and injurious effect standard from *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), applied in habeas corpus cases, *Hall v. Zenk*, 692 F.3d 793, 805 (7th Cir. 2012), and any error would be cured by the overwhelming evidence of Washington's guilt.

In sum, Claim Six is procedurally defaulted, and even if it were not defaulted, it would be properly denied as meritless.

### VII.    Claim Seven

Washington argues in Claim Seven that his post-trial counsel was ineffective for failing to raise his trial counsel's alleged ineffectiveness during closing argument. But as with Claims Four through Six, this claim was improperly asserted through Washington's *pro se* supplement brief in his postconviction appeal before the state appellate court. (Dkt. No. 72-20 at 21; Dkt. No. 72-26.) Claim Seven is thus procedurally defaulted, and Washington cannot excuse his default. *Clemons*, 845 F.3d at 820. Moreover, as explained above with respect to Claim One, counsel was not ineffective in his closing argument. And consequently, the new attorney who represented Washington post-trial was not ineffective for failing to raise the issue in a post-trial motion. Claim Seven is denied.

## VIII.   Claim Eight

Claim Eight contains Washington's argument that his attorney was ineffective for failing to raise a claim for violation of Illinois Supreme Court Rule 431(b). That rule mandates that the trial judge ask the jury venire during voir dire whether they understand and accept that: (1) the defendant is presumed innocent of the charges against him; (2) the state has the burden of proving the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to offer any evidence on his own behalf; and (4) the defendant's failure to testify at trial cannot be held against him. *Illinois v. Thompson*, 939 N.E.2d 403, 409 (Ill. 2010). Like Claims Four through Seven, however, Claim Eight was improperly asserted through Washington's *pro se* supplement brief in his post-conviction appeal before the state appellate court and is thus procedurally defaulted. (Dkt. No. 72-20 at 25; Dkt. No. 72-26.) Washington cannot excuse his default. *Clemons*, 845 F.3d at 820.

In addition, any alleged failure to comply with Rule 431(b) would be subject to harmless error review. *Illinois v. Sebby*, 89 N.E.3d 675, 693 (Ill. 2017); *Illinois v. Glasper*, 917 N.E.2d 401, 419 (Ill. 2009). When the evidence of a defendant's guilt is overwhelming, a Rule 431(b) error is considered harmless. *Glasper*, 917 N.E.2d at 419. That is the case here: any alleged Rule 431(b) violation in Washington's case would have been harmless because the evidence of his guilt was overwhelming. Claim Eight is denied.

## IX.   Claim Nine

In Claim Nine, Washington asserts that his appellate counsel was ineffective for failing to raise the various grounds of ineffective assistance of trial counsel asserted in the instant habeas corpus petition. Again, this claim was improperly asserted through Washington's *pro se*

supplement brief in his postconviction appeal before the state appellate court and is thus procedurally defaulted (Dkt. No. 72-20 at 28; Dkt. No. 72-26), with no apparent basis to excuse his default. *Clemons*, 845 F.3d at 820. Moreover, as explained above, Washington cannot demonstrate the ineffective assistance of his trial counsel, and consequently, his appellate counsel cannot be faulted for failing to raise such an argument. Accordingly, Claim Nine is denied.

### X. Claim Ten

Lastly, in Claim Ten, Washington alleges that he was indicted under a 1992 murder statute that was no longer in effect at the time of his indictment in 2006. For this reason, Washington believes the state trial court lacked subject-matter jurisdiction to hear his criminal case. Alternatively, he contends that the trial court could not impose the sentencing enhancement of twenty-five additional years based on personally discharging the firearm that killed the victim. Washington argues that his trial lawyer was ineffective for failing to raise these issues.

The indictment charges Washington with violations of the "Illinois Complied Statutes 1992 as Amended." (Dkt. No. 72-1 at 22–31.) In 1992, the Illinois General Assembly replaced the Illinois Revised Statutes with the Illinois Compiled Statutes. *See Alvarado v. Lashbrook*, No. 2018 IL App (5th) 170278-U, 2018 WL 5311447, at *2 (Ill. App. Ct. Oct. 24, 2018). The change updated the organization and numbering of the statutes but did not repeal any provision. *Id*. Thus, Washington's argument that a prior statute had been repealed and so he was charged under a non-existent law is incorrect. *Id*. Additionally, even if he were charged under a prior statute, there is no prejudice to him as the murder statute remained the same. *Id*. Washington also argues

that the twenty-five year enhancement was not in place. But that is incorrect, as the enhancement is contained at 735 ILCS 5/5-8-1(d)(iii).

As Washington's underlying arguments are meritless, his lawyer was not ineffective for failing to raise them. Claim Ten is thus denied. Furthermore, as Washington has failed to present a meritorious claim on any of the ten bases presented in his petition, his request for habeas corpus relief is denied.

**CONCLUSION**

For the reasons stated above, Washington's petition for federal habeas corpus relief (Dkt. Nos. 1, 34) is denied. The Court declines to issue a certificate of appealability, as Washington cannot make a substantial showing of the denial of a constitutional right or that reasonable jurists would debate, much less disagree, with this Court's resolution of his claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2)); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Clerk will enter judgment in favor of the respondent and against Washington.

Washington is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal in this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within twenty-eight days of the entry of judgment, *see* Fed. R. Civ. P. 59(e), and suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time

and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if filed within twenty-eight days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi). Neither the time to file a Rule 59(e) motion nor the time to file a Rule 60(b) motion can be extended. *See* Fed. R. Civ. P. 6(b)(2).

ENTERED:

Andrea R. Wood
United States District Judge

Date: September 25, 2020